IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARTHUR L. TIGGS, | |
| Petitioner, | |
| | Civ. No. 15-8664 (KM) |
| v. | |
| STEVEN JOHNSON, *et al.*, | **OPINION** |
| Respondents. | |

**MCNULTY, District Judge:**

## I.    INTRODUCTION

The petitioner, Arthur L. Tiggs, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (DE 1.) For the reasons stated herein, the petition shall be denied and no certificate of appealability shall issue.

## II.    BACKGROUND

The New Jersey Superior Court, Appellate Division, on direct appeal, summarized Mr. Tiggs's state court criminal proceedings, and the relevant evidence underlying his resulting convictions, as follows:[1]

> Lance Pettiford was shot and killed shortly before 3:00 a.m. on April 9, 2006, outside the Cave Lounge on Halsey Street in Newark. [Mr. Tiggs] was at the Cave to attend his own birthday party; he had arrived between 1:15 and 1:45 a.m.
>
> The Cave is a bar owned by Vanessa and Charles Walker. El Raqib Poole, a/k/a Namiel, who is a friend of [Tiggs's] and worked for the Walkers, helped arrange the party. Not all of those present were guests; the Cave was also open for regular business.

---

[1]    State court factual findings are presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Vanessa Walker and her cousin, Cynthia Boggs, arrived before [Tiggs], and Vanessa met him at the door and took his coat. Although there were two men stationed outside the entrance to check for weapons and identification, Vanessa did not know whether [Tiggs] was searched. Several others who were there said they had not been searched, including Poole; Boggs; Hodges Sears, who is a friend of the Walkers' son Brad; Sean Williams, a regular patron who arrived at about 2:00 a.m.; and Timothy Williams, who came with Sean Williams. Pettiford went into the Cave with Sean and Timothy Williams. There is no evidence of any disturbance, fight or altercation inside the Cave that night.

During the course of the party, [Tiggs], Sears and Poole went outside to smoke. According to Sears, his companions shared a cigar filled with marijuana rather than tobacco. While they were smoking, Pettiford and Sean Williams left the Cave and crossed the street. Timothy Williams joined them and had a bottle of liquor.

According to Poole, Timothy Williams cursed at his group from across the street. Poole was not threatened, but he noticed that [Tiggs] seemed to be upset. Poole heard [Tiggs] say, "I had a vision that somebody–somebody got shot–I popped somebody for my birthday." He told [Tiggs] to think about his son and "leave it alone."

Sears heard [Tiggs] say he wanted to "push" somebody, which Sears understood to mean that [Tiggs] wanted to shoot someone. Sears ignored the comment because he did not think [Tiggs] would do such a thing, but he also said that [Tiggs] was mildly intoxicated and appeared to have something on his mind.

Poole left. From his car he noticed [Tiggs] standing by the door of the Cave and did not see him with a gun. At 2:53 a.m., Sears went back into the Cave to find his girlfriend; [Tiggs] remained outside. After Sears found his girlfriend, they left the Cave and walked toward his truck. [Tiggs] crossed the street.

Sean Williams, still outside with Timothy Williams and Pettiford, heard one loud pop in his left ear, turned around and saw Pettiford falling into Timothy's arms. [Tiggs] ran past Sean. As [Tiggs] passed, Sean saw that he had a gun in his right hand.

Sears, still walking to his truck, also heard a gun shot. He turned and saw [Tiggs] running in the middle of the street, yelling something and holding a black "357 revolver" in his right hand.

Vanessa Walker and Boggs had left the Cave just before the shooting. Both women heard but did not see the shot fired. Boggs heard someone yell, "Oh my God. Lance got shot in the head"; she looked across the street and saw [Tiggs] with a gun in his hand, and she retreated into the Cave with Vanessa.

2

Videotapes from the Cave's four surveillance cameras were retrieved by the police who responded to the scene. The tapes from the camera mounted outside depicted some of the comings and goings of the patrons described above, including [Tiggs's] crossing the street just prior to the shooting. The shooting was not captured by the camera.

The police took statements from the witnesses and compiled a photo array. Sears, Poole, Boggs and Sean Williams all selected [Tiggs's] photo from an array and identified him in court. Sears identified him as the person who ran away with a gun after the shooting. Poole identified him as the person who said "I had a vision I popped somebody on my birthday." Boggs said [Tiggs] was the person she saw with a gun in his hand, and Sean Williams said he was the person he saw with a gun on the night of the shooting and the one who killed his cousin. Timothy Williams could not make an identification.

Later that day, [Tiggs] called Sears. He asked Sears to talk to Brad Walker so that Brad could get the Cave's surveillance tapes from his father, Charles Walker. [Tiggs] also gave Sears his new telephone number. On another occasion [Tiggs] called Sears and threatened, "[people] better get money up for my lawyer or I'm gonna say they had something to do with it." Sears hung up and called a detective.

Reservations were made in [Tiggs's] name to travel to Atlanta by train and by air. He, his girlfriend and their child used the stand-by airplane tickets on April 10, 2006. The train tickets were cancelled. On May 3, 2006, [Tiggs] surrendered to law enforcement in Orange, New Jersey.

Dr. May Jennifer Amolat, M.D., an assistant medical examiner, did the autopsy. She found that Pettiford's death was caused by a "penetrating gunshot wound of the head, located at the left forehead, proceeding left to right, front to back, and slightly downward." In her opinion, "the presence of soot in the bony skull, close to the entrance . . . [and] the extensive fragmentation of the skull bones [was] consistent with a contact wound."

The defense stipulated that [Tiggs] did not have a permit to carry a handgun. [Tiggs] did not testify or present any witnesses.

*State v. Tiggs*, No. A-2440-07T4, 2010 WL 2795363, at *1-3 (N.J. Super. Ct. App. Div. July 13, 2010).

On June 18, 2007, a jury found Mr. Tiggs guilty of: (i) first-degree murder, N.J. Stat. Ann. § 2C:11-3(a)(1)-(2); (ii) third-degree unlawful possession of a handgun, N.J. Stat. Ann. § 2C:39-5b; and (iii) second-degree possession of a firearm for an unlawful purpose, N.J. Stat.

Ann. § 2C:39-4a. *See id.* at *1. On August 17, 2007, the trial court "merged [Mr. Tiggs's]

convictions for murder and possession of a firearm with an unlawful purpose . . . and sentenced

[Tiggs] as follows: for first-degree murder, to a term of incarceration for life that is subject to the

[provisions of] the No Early Release Act, [N.J. Stat. Ann. §] 2C:43-7.2; for unlawful possession

of a handgun, to a five-year term of incarceration that is concurrent with his sentence for

murder." *Id.* (*See also* Aug. 17, 2007 Sentencing Hr'g Tr., DE 9-35.)

On July 13, 2010, the Appellate Division affirmed Mr. Tiggs's conviction and sentence

for first-degree murder. That court also "reverse[d] and vacate[d] his conviction for unlawful

possession of a handgun because the judge instructed the jury on the element of a different

weapons offense not charged in the indictment."[2] *Id.* The New Jersey Supreme Court denied

certification of Tiggs's direct appeal on November 10, 2010. *State v. Tiggs*, 12 A.3d 209 (N.J.

2010) (table).

On December 17, 2010, Mr. Tiggs filed a petition for post-conviction relief ("PCR") in

state court (the "PCR court"). *See State v. Tiggs*, No. A-1041-12T2, 2014 WL 2765611, at * 1

(N.J. Super. Ct. App. Div. June 19, 2014). The PCR court held a hearing on Tiggs's PCR

application on June 1, 2012. (PCR Hr'g Tr., DE 9-36.) On that date, the PCR court issued an

order denying Tiggs's PCR petition "for the reasons expressed in [its accompanying opinion]."

(DE 9-19 and DE 9-18, respectively.) The Appellate Division affirmed the denial of Tiggs's PCR

petition on June 19, 2014. *Tiggs*, 2014 WL 2765611, at *4. The New Jersey Supreme Court

---

[2]      Although the Appellate Division's July 13, 2010 opinion reversing the weapons conviction
directs that the case be "remanded for entry of an amended judgment of conviction," it does not appear
that such a remand ever occurred *Tiggs*, 2010 WL 2795363 at *8. Tiggs's conviction for unlawful
handgun possession has therefore been overturned, and the sentence on that count is invalid. Tiggs's
murder conviction and resulting life sentence, on the other hand, have been affirmed at all levels of the
state courts.

denied certification of Tiggs's PCR appeal on December 5, 2014. *State v. Tiggs*, 103 A.3d 267 (N.J. 2014) (table).

Mr. Tiggs filed his § 2254 petition on December 3, 2015.[3] (DE 1.) Respondents filed their answer on March 18, 2016. (DE 9.) Tiggs acknowledged receipt of Respondents' answer in his May 5, 2016 motion requesting an extension of time to submit a reply. (*See* DE 16-1 at ¶ 5.) In spite of receiving said filing extension (*see* DE 17), Tiggs has not filed a formal reply in response.

### III. STANDARD OF REVIEW

An application for a writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution, laws, or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Tiggs filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

---

[3]     December 3, 2015 is the date on which Mr. Tiggs executed his habeas pleading. (*See* DE 1 at 17.) Under the federal prisoner mailbox rule, "a document is deemed filed on the date it is given to prison officials for mailing." *Pabon v. Mahanoy*, 654 F.3d 385, 391 n. 8 (3d Cir. 2011). The Court, affording Tiggs all favorable inferences, finds that December 3, 2015 represents the earliest date on which he could have initiated this action.

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable-application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner has the burden of proof and, with respect to § 2254(d)(1), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, the court will assume that, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). Additionally, AEDPA deference is not excused when state courts issue summary rulings. For example, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it

6

may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 62 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citation omitted). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citations omitted). To the extent that a petitioner's constitutional claims are unexhausted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

## IV. ANALYSIS

Mr. Tiggs raises the following points for this Court's review:

Ground One: [Tiggs] was denied his right to a fair trial when the court erroneously advised the jury that four witnesses had all identified [Tiggs] as "the person who committed the murder."

Ground Two: [Tiggs] was denied his right to a fair trial as the jury was not properly instructed as to the charge of unlawful possession of a weapon, that conviction must be vacated.

Ground Three: [Tiggs's] right against cruel and unusual punishment was violated when the trial court sentenced him to a term of seventy-five years.

Ground Four: [Tiggs] was denied his right to a fair trial when the court erroneously advised the jury that four of the witnesses had all identified [Tiggs] as "the person who committed the murder."

Ground Five: Counsel failed to investigate and prepare pretrial; counsel failed to object on numerous occasions throughout trial; counsel failed to properly raise[] an intoxication defense or hire an expert in that regard; counsel failed to properly

inform [Tiggs] of the plea offer and its terms; counsel allowed prosecutor to commit misconduct during varying points of the trial; appellate counsel was also ineffective for failing to raise many of these same issues at the appellate level.

Ground Six: The trial court erred in denying [Tiggs's PCR petition] without affording him an evidentiary hearing to fully address his contention that he failed to receive adequate legal representation at the trial level.
(A) Trial counsel did not adequately represent [Tiggs] as a result of his failure to assert and pursue an intoxication defense rather than a defense of mistaken identification.
(B) Trial counsel did not adequately represent [Tiggs] as a result of his failure to object to certain aspects of the prosecutor's summation which exceeded the bounds of propriety.

Ground Seven: The trial court erred in denying [Tiggs's PCR petition] without affording him an evidentiary hearing to fully address his contention that he failed to receive adequate legal representation at the trial level.

Ground Eight: Because [Tiggs] established *prima facie* case of ineffective assistance of counsel, the PCR [c]ourt should have granted [an] evidentiary hearing in order to receive evidence and take testimony to ascertain trial counsel's reason for the alleged failures.

(DE 1-1 at 1-16; DE 1 at 13 (capitalization in original omitted).)

## A. Grounds One, Two, and Four: Jury Instructions

### 1. Ground Two

Mr. Tiggs asserts that because "the jury was not properly instructed as to the charge of [third-degree] unlawful possession of a [firearm without a permit, N.J. Stat. Ann. § 2C:39-5b], that conviction must be vacated." (DE 1-1 at 2-3.)

When Tiggs raised this issue on direct appeal, the State conceded (DE 9-9 at 31), and the Appellate Division agreed. Tiggs's "conviction for unlawful possession of a weapon [was accordingly] vacated" by the appellate court. *Tiggs*, 2010 WL 2795363, at *4. Nothing in the record before this court suggests that Tiggs was ever thereafter retried or resentenced on this charge. Based on everything before me, the weapons possession conviction was vacated, and

remains so. Mr. Tiggs's Ground Two is therefore denied as moot, because he has already obtained the relief he seeks on direct appeal.

### 2. *Grounds One and Four*

Tiggs claims that he was denied his right to a fair trial because the trial court's jury charge erroneously advised the jurors that four witnesses had identified Tiggs as "the person who committed the murder." (DE 1-1 at 1-2, 6.) Here, Tiggs refers to the following portion of the trial court's charge to the jury:

> Here the State has presented the testimony of Hodge Sears, Sean Williams, Cynthia Boggs, and [El Raqib] Poole. If you'll recall that these witnesses identified [Tiggs] in court as the person who committed the murder.
>
> The State also presented testimony that on a prior occasion before this trial, these witnesses identified [Tiggs] as the person who committed these offenses.

(DE 1-1 at 1.) This statement, says Tiggs, "was not only completely inaccurate, but overwhelmingly prejudicial to [Tiggs's] constitutional right to a fair trial." (*Id.*) He adds that the "statement was clearly misleading . . . [and] led the jury to an unjust verdict." (*Id.* at 6.)

"[A]n error in the instructions to the jury" may support habeas relief if it rises to the level of a denial of due process. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). "The question [during habeas review] is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violate[d] due process." *Id.* (citation and internal quotation marks omitted); *accord Waddington v. Sarausad*, 555 U.S. 179, 191 (2009). The challenged instruction "may not be judged in artificial isolation," but must be viewed in the context of the overall charge and the trial record. *Cupp v. Naughton*, 414 U.S. 141, 146 (1973). It is the rare case in which "an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment." *Henderson*, 431 U.S. at 154; *accord*

*Middleton v. McNeil*, 541 U.S. 433, 437 (2004) ("not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.").

In order to obtain habeas relief, a petitioner must establish that the instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). For example, due process is violated where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (3d Cir. 1997); *see also Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (noting that due process is violated when "the instruction contained some ambiguity, inconsistency, or deficiency," and "there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.") (internal quotation marks omitted).

On direct appeal, Tiggs raised essentially the same point he now raises in Grounds One and Four. (*See* Pet. Direct Appeal Br. at Point One, DE 9-8.) The Appellate Division extensively analyzed the merits of those claims:

There is no question that the trial judge misspoke when referring to the identification evidence. He stated that four of the witnesses had identified [Tiggs] as the person who committed the murder, which is not consistent with the testimony or the evidence documenting the out-of-court identifications. The State contends that the judge's mistake, viewed in the context of the charge as a whole and the trial evidence, had no capacity to prejudice [Tiggs]. We agree.

The portion of the charge at issue is as follows:

Here the State has presented the testimony of Hodge Sears, Sean Williams, Cynthia Boggs, and [El Raqib] Poole. If you'll recall that these witnesses identified [Tiggs] in court as the person who committed the murder.

The State also presented testimony that on a prior occasion before this trial, these witnesses identified [Tiggs] as the person who committed these offenses.

The defense did not object to this misstatement at trial, which we may infer indicates that the defense did not deem this obvious misstatement to be prejudicial at the time. *State v. Macon*, 57 N.J. 325, 333, 273 A.2d 1 (1971). In any event, the failure to object requires us to review this misstatement for plain error-error that is "'clearly capable of producing an unjust result.'" *State v. Taffaro*, 195 N.J. 442, 454, 950 A.2d 860 (2008) (quoting *R.* 2:10-2).

"In the context of a jury charge, plain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of [Tiggs] sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" *State v. Burns*, 192 N.J. 312, 341, 929 A.2d 1041 (2007) (quoting *State v. Jordan*, 147 N.J. 409, 422, 688 A.2d 97 (1997)). The prejudicial capacity "must be evaluated in light 'of the overall strength of the State's case.'" *Ibid.* (quoting *State v. Chapland*, 187 N.J. 275, 289, 901 A.2d 351 (2006)).

The misstatement was blatant. The witnesses did not say that they saw [Tiggs] shoot Pettiford, but the State made that clear from the outset and never suggested otherwise. In his opening statement, the prosecutor said that none of the witnesses "actually saw [Tiggs] squeeze the trigger" and that "none of them saw it." In his summation, the prosecutor discussed what the witnesses said they saw and their comings and goings as depicted on the videotape. Defense counsel also emphasized that sole weakness in the State's proofs. In short, there was no room for confusion on the point about which the judge misspoke.

There is more than the fact that the misstatement was too apparent to be misleading to indicate that this error was harmless. A reviewing court must view a jury instruction as a whole. In part pertinent to this misstatement, the judge instructed the jurors that they were the judges of the facts. He also directed them that "[r]egardless of what counsel said or I may have said [in] recalling the evidence in this case, it is your recollection of the evidence that should guide you as judges of the facts."

In the absence of evidence to the contrary, courts presume that jurors follow clear instructions from the judge. *State v. Burris*, 145 N.J. 509, 531, 679 A.2d 121 (1996). Here, there is nothing that would allow us to conclude that the jurors ignored the judge's directions on their obligation to decide the facts for themselves. This jury deliberated for two days during which they asked for a re-play of testimony. That course of conduct demonstrates careful consideration of the evidence, not a determination based upon the judge's passing and unfortunately mistaken reference to the identification evidence.

> Finally, the State's circumstantial evidence establishing [Tiggs's] identity as the shooter and his state of mind was overwhelming. The jury heard [Tiggs's] friends testify about what he said prior to the shooting, saw a videotape showing him crossing the street just before the shooting, and listened to eyewitness accounts of [Tiggs] running away with a gun in his hand.
>
> Viewing the charge as a whole and the strength of the State's evidence, we have no doubt that this passing and mistaken description of the identification was incapable of leading the jury to reach a verdict that it would not have reached if the judge had not misspoken.

*Tiggs*, 2010 WL 2795363, at *3-4.

I have reviewed the relevant portions of the trial record. The Appellate Division addressed this claim, applying a stringent plain-error standard. The Appellate Division's summary of the witnesses' identification-related testimony at trial is accurate. (*See* May 29, 2007 Trial Tr., DE 9-28 (Sears testimony); May 30, 2007 Trial Tr., DE 9-29 (Sears, Boggs, and Williams testimony); and May 31, 2007 Trial Tr., DE 9-30 (Poole and Walker testimony).) Sears testified that he had known Tiggs for "[a]bout two and a half years" and that Tiggs was "like his brother." (DE 9-28 at 4.) Shortly before Pettiford was killed, Sears testified, Tiggs stated that he wanted to shoot someone; although Tiggs may have been "mildly intoxicated" at the time, he "was sharp, he was thinking straight." (DE 9-28 at 12-13.) El Raqib Poole, another friend of Tiggs, corroborated Sears's account. (DE 9-30 at 10-11, 54-55.) Sears also testified to seeing Tiggs "running in the street . . . with a pistol in his right hand" immediately after Sears heard a gunshot in vicinity of the Cave Lounge. (DE 9-28 at 15-17.) Cynthia Boggs, who was also at the Cave Lounge on that night, testified that she observed Tiggs – and Tiggs alone – standing across the street from Cave Lounge holding a gun in his hand shortly after she heard "what sounded like a fire cracker." (DE 9-29 at 51, 84-85.) Lance Pettiford's cousin, Sean Williams, testified that he heard a loud pop, saw his cousin fall, and then observed Mr. Tiggs run by him with "a gun in his right hand." (DE 9-29 at 89, 96.) Williams made clear that Pettiford was "shot in the head" just

"a few feet away from [him]." (DE 9-29 at 111.) The foregoing witness testimony was further corroborated by the prosecution's contemporaneous display of Cave Lounge surveillance footage. (*See generally* DE 9-28, DE 9-29, and DE 9-30.) I have also reviewed the entirety of the trial court's charge to the jury. (*see* June 14, 2007 Trial Tr., DE 9-33)

The challenged language of the jury charge was in one sense accurate; that is, the testimony of those four witnesses could be said to have "identified [Tiggs] in court as the person who committed the murder." The judge's statement was inaccurate, however, to the extent it implied that any witness had stood up in court, pointed to the defendant, and stated that he or she had seen him fire the gun into the victim. The four witnesses' testimony *tended* to identify Tiggs as the murderer—not directly, however, but only circumstantially or by inference. I therefore agree that the trial judge's characterization of the evidence was not entirely accurate.[4]

I also agree with the Appellate Division, however, that the trial judge's statements could not have affected the verdict: "[T]he State's circumstantial evidence establishing [Tiggs's] identity as the shooter and his state of mind was overwhelming"; "the [trial judge's] passing and mistaken description of the identification [evidence within the charge,]" when "viewed in the context of the charge as a whole and the trial evidence, [did not] prejudice [Tiggs]." *Tiggs*, 2010 WL 2795363, at *3-4. I agree that the portion of the jury charge now challenged by Tiggs on habeas review did not "so infect[] the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. at 72 (citing *Cupp*, 414 U.S. at 147) (internal quotations omitted).

---

[4]     The lack of any objection, however, tends to suggest that those present did not give the trial judge's statements their most damaging interpretation, or perceive the need for a correction.

I thus conclude that the Appellate Division's rejection of the same claims now advanced as Grounds One and Four was neither contrary to nor an unreasonable application of clearly established federal law, and that its ruling with respect to those claims did not represent an unreasonable determination of the facts in light of the record of Mr. Tiggs's state court proceedings. Habeas relief on Grounds One and Four is therefore denied.

## B. Ground Three: Illegal Sentence

Mr. Tiggs asserts that the life sentence imposed on him as a result of his conviction for first-degree murder violates the constitutional prohibition against cruel and unusual punishment and is unsupported by the relevant sentencing factors relied on by the trial court. (DE 1-1 at 3-5.) The Appellate Division rejected this claim on direct appeal. *See Tiggs*, 2010 WL 2795363, at *5-8. That court "[saw] no basis for disturbing the sentence. It is based upon the judge's conscientious consideration of aggravating factors supported by the record and applied in accordance with the law." *Id.* at *7. I also independently note that the New Jersey sentencing statute governing first-degree murder convictions expressly mandates a sentence of between "30 years and life imprisonment." N.J. Stat. Ann. § 2C:11-3(b)(1).

Short of a claim that a sentence constitutes cruel and unusual punishment prohibited by the Eighth Amendment, or that it is arbitrary or otherwise in violation of due process, the legality and length of a sentence present questions of state law over which this Court has no jurisdiction under § 2254. *See Chapman v. United States*, 500 U.S. 453, 465 (1991) ("the court may impose . . . whatever punishment is authorized by statute for [an] offense, so long as that penalty is not cruel and unusual, and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment"); *Gibbs v. Bartkowski*, No. 11-1137 (NLH), 2018 WL 2002786, at *15 (D.N.J. Apr. 30, 2018) (applying *Chapman* to unconstitutional

14

sentence claim raised in a § 2254 petition), *reconsideration denied*, 2018 WL 3201782 (D.N.J. June 29, 2018).

Tiggs's life sentence for first-degree murder is not unconstitutional under the foregoing standards. *See Velez v. Lagana*, No. 12-0430 (DRD), 2015 WL 2344674, at *12 (D.N.J. May 14, 2015). First, the record demonstrates that this sentence was not arbitrary and was instead based on the trial court's "conscientious consideration of aggravating factors." *Tiggs* at *7. In addition, the life sentence imposed on Tiggs is within the permissible sentencing range under New Jersey law. The New Jersey courts' adjudication of this issue was therefore neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. *See Velez* at *12. I will accordingly deny habeas relief on Ground Three.

## C. Ground Five and Ground Six: Ineffective Assistance of Counsel

Tiggs claims that he is entitled to habeas relief because he received ineffective assistance of trial counsel. (DE 1-1 at 7-13.) More specifically, Tiggs asserts that his trial counsel, Chris Rojas, was ineffective based on Mr. Rojas's failures to: (1) "investigate and prepare pretrial"; (2) "object on numerous occasions throughout trial"; (3) "properly raise[] an intoxication defense"; (4) "properly inform [Tiggs] of the plea offer and its terms"; and (5) prevent or object to the prosecutor's "commit[ing] misconduct during varying points of the trial." (DE 1-1 at 7.) Tiggs also claims that his appellate counsel, Susan Brody, was "ineffective for failing to raise many issues [not specified] at the appellate level." (*Id.*) These claims are all governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984); *accord Lewis v. Johnson*, 359 F.3d 646, 656 (3d Cir. 2004) (*Strickland* test applies to the performance of both trial and appellate counsel).

Under *Strickland*, a habeas petitioner first "must show that counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). With respect to evaluating whether counsel's performance was deficient under *Strickland*, the "proper standard . . . is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential [and] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Pursuant to *Strickland*, a habeas petitioner must also demonstrate that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299. In other words, a petitioner must additionally demonstrate that counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 692-93. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Shedrick*, 493 F.3d at 299.

In addition, "[w]hen a federal habeas petition under § 2254 is based upon an ineffective

assistance of counsel claim, '[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable,' which 'is different from asking whether defense counsel's performance fell below *Strickland's* standard.'" *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington*, 562 U.S. at 101). "Federal habeas review of ineffective assistance of counsel claims is thus 'doubly deferential.'" *Id.* (quoting *Cullen*, 563 U.S. at 190).

### 1. Trial Counsel's Pretrial Investigation and Preparation

Tiggs asserts that Mr. Rojas's pretrial preparation with respect to certain witnesses' identification-related evidence was deficient. Under *Strickland*, defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

What trial counsel should have done, according to Tiggs, was obtain a *Wade* hearing to challenge in-person or photographic identification evidence, and "should have also ascertained how the court would treat the identification of witness [P]oole." (DE 1-1 at 7.) Tiggs asserted identical arguments in support of his PCR application. (*See* Pet. PCR Br., DE 9-16 at 7-8.) The PCR court found that those claims fell short of the threshold for relief under *Strickland*:

> [Tiggs] argues that trial counsel was ineffective during the pretrial stage by failing to request a *Wade* hearing challenging the identification, or suggestiveness of the photo array used by the witnesses to identify [Tiggs]. A *Wade* Hearing[5] requires

---

[5]     The reference is to *United States v. Wade*, 388 U.S. 218 (1967). With respect to an ineffective assistance claim based upon failure to move to suppress identification evidence, a petitioner must show

the showing of some evidence of impermissible suggestiveness. *State v. Rodriguez*, 264 N.J. Super. 261, 268-270 (App. Div. 1993). In the present case, there was no evidence of suggestiveness. Witnesses, Hodges Sears and [El Raqib] Poole were friends of [Tiggs], therefore there is no identification issues pertaining to these two witnesses. Cynthia Boggs and Vanessa Walker also made photograph identification of [Tiggs] and there is no evidence of suggestiveness. Furthermore, the videotape in evidence placed [Tiggs] at the scene of the crime.

(DE 9-18 at 9.) The Appellate Division affirmed that ruling, "substantially for the reasons stated by [the PCR court]." *Tiggs*, 2014 WL 2765611, at *2. On review, I conclude that the facts recited by the PCR court are consistent with the trial record. (*See generally* DE 9-28, DE 9-29, and DE 9-30.)

Reliability is the "linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 106, 114 (1977); *see also United States v. Wise*, 515 F.3d 207, 215 (3d Cir. 2008). The purpose of a *Wade* hearing is therefore to determine whether identification testimony should be suppressed because the manner in which the identification of the suspect was obtained was unduly suggestive. *United States v. Wade*, 388 U.S. 218, 242 (1967); *see also Neil v. Biggers*, 409 U.S. 188, 198 (1972) ("Suggestive confrontations are disapproved because they increase the likelihood of misidentification"). Admissibility hinges on "whether under the totality of the circumstances the identification was reliable" despite suggestive procedures. *Brathwaite*, 432 U.S. at 106 (citation omitted); *see also United States v.*

---

that he likely would have prevailed on the suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted. [Therefore, the federal court,] in order to determine whether a motion to suppress would have been granted, ... must determine (1) whether the identification process was unduly suggestive and, if so, (2) whether the totality of the circumstances nonetheless render[ed] the identification reliable.

*Koonce v. Cathel*, No. CIV.A. 05-5068 (JLL), 2006 WL 2772150, at *16–17 (D.N.J. Sept. 23, 2006) (citing *Thomas v. Varner*, 428 F.3d 491, 502–03 (3d Cir. 2005) (*citing, inter alia, Neil v. Biggers*, 409 U.S. 188 (1972)).

*Maloney*, 513 F.3d 350, 355 (3d Cir. 2008). Where, for example, "identifications were entirely based upon observations at the time of the [incident] and not at all induced by" suggestive pretrial identification procedures, the subsequent in-court identification testimony does not violate due process. *See Coleman v. Alabama*, 399 U.S. 1, 6-7 (1970).

Absent from this record is any threshold indication of an impermissibly suggestive identification procedure. The reliability of the identifications was therefore a fact issue for the jury, like any other. Here, there are no circumstances that raise reliability concerns at all, let alone constitutional issues or admissibility questions.

Two of the identifying witnesses knew Tiggs personally. *See Herrill v. Ricci*, No. 10-3575 (ES), 2016 WL 1183176, at *18 (D.N.J. Mar. 28, 2016) (denying habeas relief on claims that counsel was ineffective for failing to challenge witness identification testimony because "as the circumstances in this case show, the witnesses' identifications of [the § 2254 petitioner] as the shooter were not the result of suggestive identification procedures, but rather, were based on the witnesses' familiarity with [p]etitioner from the New Year's Eve party."); *United States v. Shakur*, No. SSS82-CR-312-CSH, 1987 WL 5368, at *2-3 (S.D.N.Y. 1987) (holding that a pretrial *Wade* hearing would have been a "futile exercise" when the witnesses had extensive personal acquaintances with the defendant).

Two other witnesses identified Tiggs from a photographic array. The court found the array was not impermissibly suggestive, and Tiggs has suggested no facts to the contrary. *See State v. Henderson*, 208 N.J. 208, 238, 27 A.3d 872, 890 (2011) ("Procedurally, a defendant must first 'proffer ... some evidence of impermissible suggestiveness' to be entitled to a *Wade* hearing.").

These facts support the PCR court's ultimate finding that Mr. Rojas did not provide ineffective assistance by failing to obtain a *Wade* hearing or otherwise challenge the admissibility of the identification-related evidence produced at trial. I cannot conclude that the state courts' analysis of this claim represented an unreasonable application of *Strickland*.

### 2. Counsel's Failure to Object to Certain Testimony

Tiggs also claims that Mr. Rojas erred in failing to object to those portions of Sears's testimony indicating: (1) that the news media inaccurately reported that murder victim Pettiford's homicide was "gang related"; (2) that Tiggs would implicate Sears in the murder unless he helped pay for a lawyer to represent Tiggs; and (3) that Tiggs was only mildly intoxicated on the evening of Pettiford's murder. (DE 1-1 at 7-8.)

The PCR court's decision does not address Sears's testimony regarding media coverage of Pettiford's murder. The reference is to a prosecution question about some "incorrect" information that the police had, which Sears answered as follows:

> What I was hearing on t.v. is that there was – there was a shooting, and there – it was all types of stuff. There was – I'm just trying to more directly to your answer. As far as the motive, they were saying there was a motive, there was a fight; it was gang related, I heard. There was a fight that broke out, and it resulted in someone getting shot, and things of that nature I was just – I was just hearing. That information was all incorrect, and I knew that.

(DE 9-29 at 42.)

The testimony was elicited in the context of clarifying Sears's prior testimony regarding his decision to speak to the Newark Police Department about Pettiford's shooting; it is also relevant to the incriminating information that Sears thereafter provided to police inculpating Tiggs as the shooter. The evidence therefore had a purpose, and competent counsel would not have necessarily perceived that a challenge to admissibility was required or would have been fruitful. More fundamentally, however, there is no showing of prejudice in the sense that but for

Mr. Rojas's failure to object to this evidence, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The sense of the testimony is that the police and media had it all wrong; Sears was describing information that he characterized as "all incorrect." Such testimony would not have inculpated Tiggs, whether fairly or unfairly. This portion of the claim therefore fails to support an award of habeas relief.

The second two elements of the claim—pertaining to retention of a lawyer and intoxication—were specifically raised in Tiggs's PCR application and decided by the court. (*See* Pet. PCR Br., DE 9-16 at 7-8.) The PCR court held that these two claims did not give rise to a viable *Strickland* claim:

> [Tiggs] claims that trial counsel should have objected to Hodges Sears' testimony on [Tiggs's] state of mind as being intoxicated after consuming alcohol and smoking marijuana as well as to Sears' perception of threat of the [Tiggs] implicating him and Poole in the incident if money was not raised to fund a defense lawyer. The testimony of the witness in both cases is relevant to the state of mind of [Tiggs]. First, the intoxication testimony is relevant to [Tiggs's] state of mind immediately prior to the homicide. Second, [Tiggs's] attempts to tamper with witnesses reflect on a guilty conscience. *See State v. Burden*, 393 N.J. Super. 159, 172 (App. Div. 2007), *certif. den.* 196 N.J. 344 (2008).

(DE 9-18 at 9.)

The Appellate Division affirmed that ruling "substantially for the reasons stated by [PCR court]." *Tiggs*, 2014 WL 2765611, at *2. I agree that the testimony would likely have been ruled relevant and admissible. Rojas did not fall below acceptable professional standards in failing to object to its admission. *See D'Amario v. United States*, 403 F. Supp. 2d 361, 370 (D.N.J. 2005) ("Counsel was not ineffective for failing to object to testimony for which there was no factual basis to object.") That Tiggs was somewhat intoxicated, but not overly so, was relevant to his state of mind. (*See* Section IV.C.3, *infra*.) That Tiggs threatened to falsely implicate Sears was relevant to his guilty knowledge and state of mind, particularly in the context of other evidence

that Tiggs attempted to tamper with evidence using Sears as an intermediary. (*See* Section IV.C.4, *infra*.)

A competent attorney could easily have concluded that there was no compelling basis for a challenge to the admissibility of this evidence. Even if erroneous, its admission would be harmful in light of the overwhelming evidence. I cannot conclude that the state courts' analysis with respect to this claim represents an unreasonable application of *Strickland*.

### 3. Counsel's Failure to Present an Intoxication Defense

Mr. Tiggs asserts that his trial counsel rendered ineffective assistance by opting to pursue a defense based on mistaken identification instead of an intoxication defense. (DE 1-1 at 7-9.) More specifically, [Tiggs] avers that he "drank alcohol and used marijuana just minutes prior to the incident, [and thus,] defense counsel should have opted for an intoxication defense . . . Counsel should have also retained an expert to . . . [provide] testimony at trial[] concerning the effects [the ingestion of these substances] would have on someone." (DE 1-1 at 8.) Tiggs made the same claim during his PCR proceedings. (*See* Pet. PCR Br., DE 9-16 at 5-6.) The PCR court rejected this claim:

> [P]ursuant to N.J.S.A. 2C:2-8, an intoxication defense is permitted only if there is a showing of "prostration of faculties" which negates the mental element of the crime charged. *State v. Cameron*, 104 N.J. 43, 57-58 (1986). The State presented evidence that [Tiggs] was mildly intoxicated but coherent. Therefore, no evidence that would have supported an intoxication defense existed.

(DE 9-18 at 10.)

In affirming that portion of the PCR court's decision, the Appellate Division made the following additional observations:

> With respect to [Tiggs's] claim based on intoxication, there is no question that "[a]s a general principle, 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *State v. DiFrisco*, 174 N.J. 195, 223 (2002) (quoting *State v. Martini*, 160 N.J.

248, 266 (1999) (quoting *Strickland, supra*, 466 U.S. at 691, 104 S. Ct. at 2066, 80 L. Ed.2d at 695)). As we understand the PCR judge's determination, he concluded that given the level of intoxication required to prevail on a claim of intoxication, precluding a defendant from acting with the mental state that is an element of the crime, reasonable trial counsel would not have pursued that defense.

To obtain a conviction for murder, other than felony murder, the State must prove that [Tiggs] acted purposely or knowingly. N.J.S.A. 2C:11–3. Evidence of intoxication is admissible to disprove either of those mental states. *Cameron, supra*, 104 N.J. at 53; N.J.S.A. 2C:2–8. "[T]he intoxication must be of an extremely high level" and the standard is "prostration of faculties." *Cameron, supra*, 104 N.J. at 54. The defense is unavailable where the evidence does not give rise to "the slightest suggestion that [Tiggs] did not know what [he] was doing or that [his] faculties were so beclouded . . . that [he] was incapable of engaging in purposeful conduct." *Id.* at 57.

On this record, we agree with the PCR judge that there was insufficient evidence to suggest an intoxication defense sufficiently viable to warrant investigation. Thus, [Tiggs] failed to establish deficient performance. Moreover, [Tiggs] did not provide any evidence supporting a finding of prejudice from counsel's failure to investigate. That would require some evidence suggesting that an investigation could or would have been productive, and [Tiggs] presented nothing to make that showing. Because [Tiggs] failed to make a *prima facie* showing of either deficient performance or resulting prejudice, [Tiggs] was not entitled to an evidentiary hearing or relief on this claim.

*Tiggs*, 2014 WL 2765611, at *3.

In light of the factually supported, legally sound reasons detailed above, I agree that Mr. Rojas's strategic decision to forgo an intoxication defense was not deficient under *Strickland*. *See Hess v. Mazurkiewicz*, 135 F.3d 905, 908 (3d Cir. 1998) (counsel's strategic trial decisions receive "great deference"); *Gibbs*, 2018 WL 2002786, at *11 (D.N.J. Apr. 30, 2018) ("counsel not ineffective for failing to argue an intoxication defense where "[t]he record present[ed] no conclusive evidence that Petitioner was intoxicated during the shooting" and where "counsel sought to develop the theory of self-defense, and cannot be faulted for failing to argue a second theory.").

23

If Mr. Tiggs's contention is that counsel should have pursued an intoxication defense *instead of* a mistaken-identity defense, I cannot find deficient performance. For the reasons stated above, the evidence did not suggest anything approaching the necessary level of intoxication.

If Mr. Tiggs's contention is that counsel should have pursued an intoxication defense *in addition to* an identification defense, there is additional reason to defer to counsel's strategic choices. As noted, the intoxication defense, viewed singly, was not promising. Moreover, competent counsel might have prudently concluded that alternative defenses (that Tiggs did not pull the trigger, but if he did, he was too drunk to form criminal intent), while technically permissible, would have backfired with the jury.

Nothing in the record suggests that the state courts' decision on this point represents an unreasonable application of *Strickland*. I will accordingly deny habeas relief on this claim.

### 4. Failure to Object to Improper Actions of the Prosecution at Trial

Mr. Tiggs asserts that counsel rendered ineffective assistance by failing to object to statements made by the prosecution throughout trial. Initially, I note that although this claim is ultimately resolved under *Strickland*, I have also considered it substantively. That is, I have "examine[d] the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant" and considered whether the prosecutor's now-challenged actions infected Mr. Tiggs's trial with such unfairness as to make his resulting murder conviction a denial of due process. *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001) (setting forth standard governing claims of prosecutorial misconduct on habeas review).

In Ground Five, Tiggs specifically claims that counsel should have objected to: (1) the comments made by the prosecutor during his opening and closing statements about the credibility of witnesses Cynthia Boggs, Hodges Sears, and Sean Williams; (2) "the State's disparaging remarks [about] the defense" made during closing; and (3) other improper comments "about defense counsel's trial strategy" made by the prosecution "frequently throughout the trial." (DE 1-1 at 7-8; 12-14.) In Ground Six, Tiggs relatedly challenges the following two specific portions of the prosecutor's closing statement. In the first passage, the prosecutor summarized portions of Sears's testimony as follows:

> What does Hodges Sears say the next day when he's talking to the police? He says, you know, I got a call from [Tiggs] today. April 9th, the day of the shooting, later that day. And he says to me – well let's see, Mr. Rojas says he's innocent. He didn't do anything. [Then] I guess [Tiggs] called his friend and said, hey you know, yeah I ran away just like we all did. I'm going to down [to] tell the cops I didn't do it. Aren't you? I was there, I'll tell the cops what I saw. No he doesn't say that. Does he? No, he doesn't say [h]e's innocent. What does he say? Hey, can you talk to Brad, the [Cave Lounge] owner's son, about getting [its video surveillance] tape. What tape? This tape. This tape, oh yeah, I want the tape. Not hey, can we go – can you go down? You know I didn't do anything. No, can you get the tape. Why do you think that is, *i.e.* before the cops get it, basically was the point of that statement. Why? Why? Innocent? Do you still think he's innocent?

(DE 9-32 at 62:15-63:5.) In the second passage, the prosecutor emphasized Tiggs's apparent lack of interest in retrieving a set of keys which he left at Cave Lounge on the night of Pettiford's murder:

> Did you ever lose your keys? Who hasn't. Right? What do you do? You start going crazy looking for your keys. Geez. I left my keys. I got to go back and get my keys. I mean it's something you need. You need keys. . . .
>
> Does [Tiggs] call the Cave Lounge? . . . If you're innocent what's the big deal? Oh, I left my keys there. I run away that night, fine. Everyone runs, everyone ran that night, that doesn't mean anything. But the next day, you know what, I left my keys there. Hello, I got to come down there and get my keys. Do you got my hoodie down there, Vanessa?[6] My keys are in it, I got to come down and get

---

6      Vanessa Walker is the Cave Lounge's owner. At trial, Ms. Walker testified, among other things, that Mr. Tiggs was one of her regular customers, and that the keys referenced by the prosecutor during

them. Why doesn't he do that? Why doesn't he do that? The only thing he's
concerned about the next day is getting [the Cave Lounge's surveillance tape].
Isn't he? Oh yeah, yeah. He's concerned about that tape. I want that tape, but hell
I don't need my keys, because I'm not going to be around very long anyway.

(DE 9-32 at 64:17-65:10.) Tiggs avers that both of these statements "exceeded the bounds of

propriety." (*See* DE 1-1 at 12-13.)

Tiggs raised all of these Ground Five and Ground Six challenges in his PCR ineffective

assistance of counsel claim. (*See* Pet. PCR Br., DE 9-16 at 9-12.) The Appellate Division first

noted a procedural bar:

> The [PCR court] did not address [Tiggs's] claim of ineffective assistance based on
> his allegation that trial counsel failed to object to impermissible conduct on the
> part of the prosecutor, because the judge concluded that these claims, which
> [Tiggs] based solely on the trial record, were procedurally barred because [Tiggs]
> could and should have raised them on direct appeal.
>
> The objections to the prosecutor's conduct raised by [Tiggs's] PCR counsel in the
> trial court were to: impermissible comment on defense strategies and deficiencies
> in the defense; impermissible vouching for a witness; and impermissibly urging
> the jurors to consider if the civilian witnesses called by the State had any motive
> to lie.

*Tiggs*, 2014 WL 2765611, at *2-3. The Appellate Division did not stop there, however. It then

explored the substantive merits of Tiggs's prosecutorial misconduct claims:

> On this appeal, [Mr. Tiggs] points to two passages from the prosecutor's
> summation [the same ones cited in this habeas petition, Ground Six, Subpart (B)]
> that he contends amounted to "impermissible comment upon [Tiggs's] failure to
> testify at trial," which [Tiggs] claims was accomplished by the prosecutor's
> posing rhetorical questions that could only have been answered if [he] testified.
>
> Setting aside the fact that this ground for objecting to the summation was not
> presented in the trial court, we have reviewed the passages set forth in [Tiggs's]
> brief on this appeal and conclude that they do not, as [Tiggs] suggests, carry a
> subtle reference to [Tiggs's] decision to exercise his right to remain silent.

---

summation were found in the pocket of the hooded sweatshirt that Tiggs left at the Cave Lounge on the
night Pettiford was shot. (DE 9-30 at 95-102.)

In the first passage, the prosecutor refers to what [Tiggs] said to a friend and notes that [Tiggs] did not tell his friend he was innocent. The prosecutor followed those comments with a discussion of what [Tiggs] did ask his friend to do—talk to the owner of the Cave about getting the Cave's surveillance tapes.

In the second passage, the prosecutor refers to [Tiggs's] failure to return to the Cave on the day after the shooting to retrieve the car keys and hooded sweatshirt he left behind the night before. In addition, he asks the jury to consider whether this conduct is inconsistent with that of an innocent person. The prosecutor followed those comments on the evidence with another reference to the efforts [Tiggs] made to secure tapes from the Cave's surveillance cameras.

Because the passages of the State's closing argument to which [Tiggs] objects on this appeal were permissible arguments based on the evidence presented, *State v. Frost*, 158 N.J. 76, 82 (1999), [Tiggs's] trial counsel and counsel on direct appeal[7] were not deficient for failing to object. If for no other reason, it would be improper to grant relief for failure to object to a permissible argument because [Tiggs] cannot show prejudice attributable to a failure to raise an objection that would have been denied. Accordingly, [Tiggs] is not entitled to an evidentiary hearing or relief on these claims, and his [additional] arguments to the contrary have insufficient merit to warrant any additional discussion.

*Id.* at *4.

The state courts' resolution of this portion of Tiggs's ineffective assistance of counsel claim does not constitute an unreasonable application of *Strickland*. While noting the procedural default, it also considered the claims substantively, establishing that there was no prejudice. The statements in summation were permissible, and they did not, directly or by inference, comment on Tiggs's exercise of his Fifth Amendment right to remain silent. Introduction of damning evidence to which the defendant has no answer does not constitute a Fifth Amendment violation.

The evidence, moreover, was strong, precluding a finding that any arguable error affected the verdict. "[T]he State's circumstantial evidence establishing [Tiggs] as the shooter and his state of mind was overwhelming. The jury heard [Tiggs's] friends testify about what he said

---

[7]     This is the only portion in any of the state courts' written decisions that expressly speaks to the actions of Tiggs's appellate counsel.

prior to the shooting, saw a videotape showing him crossing the street just before the shooting, and listened to eyewitness accounts of [Tiggs] running away with a gun in his hand." *Tiggs*, 2010 WL 2795363, at *4. It is against this factual backdrop that I must agree that Tiggs has failed to establish that the challenged "prosecutorial conduct . . . infect[ed] the trial with such unfairness as to make [Tiggs's] resulting conviction a denial of due process," *see Moore*, 255 F.3d at 107, much less show that "but for [trial and appellate counsel's wholly unsubstantiated] unprofessional errors, the result of [Tiggs's] proceeding would have been different." *Strickland*, 466 U.S. at 694.

### 5. *Ineffective Assistance of Appellate Counsel*

The state courts' decisions contain no more than a passing reference to the actions of Tiggs's appellate counsel, Susan Brody. (*See* n.7, *supra*, and accompanying text.) Mr. Tiggs has not indicated which specific issues Ms. Brody failed to raise "at the appellate level." (*See* DE 1-1 at 7.) He has furnished no basis for me to conclude that Ms. Brody "ignored issues that were clearly stronger than those [which she] presented [on direct appeal]." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). As a result, Tiggs has demonstrated neither deficient performance nor resulting prejudice from Ms. Brody's actions, and has therefore failed to satisfy the test of *Strickland*.[8] *Herrill v. Ricci*, No. 10-3575 (ES), 2016 WL 1183176, at *23 (D.N.J. Mar. 28, 2016) ("Petitioner's ineffective assistance of appellate counsel claim is denied for lack of merit because Petitioner has demonstrated neither deficient performance nor resulting prejudice.").

For these reasons, I will deny habeas relief based on Mr. Tiggs's claim of ineffective assistance of appellate counsel.

---

[8]    I observe parenthetically that Ms. Brody's efforts bear some hallmarks of effectiveness. She prepared a brief on direct appeal (*see* DE 9-8) that resulted in Tiggs's conviction for unlawful possession of a handgun being vacated.

*6. Trial Counsel's Purported Failure to Advise Tiggs of His Sentencing Exposure*

b.(1) Murder is a crime of the first degree but a person convicted of murder shall be sentenced, except as provided in paragraphs (2), (3) and (4) of this subsection, by the court to a term of 30 years, during which the person shall not be eligible for parole, or be sentenced to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.

N.J. Stat. Ann. § 2C:11-3(b)(1).[9]

Tiggs asserts that trial counsel, Mr. Rojas, "failed to provide [him] with necessary information in order to make [an] informed decision [on] whether to accept the state's plea offer of 22 years" because he "informed [Tiggs] that he was only facing the maximum of thirty (30) year[s]." (DE 1-1 at 8.) The PCR court rejected this claim. The claim lacked merit, said the PCR court, because "trial counsel had numerous conferences with [Tiggs] concerning the possibility of a plea offer" and because "[Tiggs] signed a pretrial order that delineated the plea offer and the [trial court] reviewed it with him." (DE 9-18 at 10.) This portion of the PCR court's decision was summarily affirmed by the Appellate Division. *Tiggs*, 2014 WL 2765611, at *2.

The consultations between Rojas and his client, of course, are not of record. The brief for the State on PCR states explicitly that the pretrial order "delineated the States' Plea Offer *and Sentencing exposure if convicted.*" (DE 9-17 at 18 (emphasis added).) The PCR judge (Judge Vena, who also presided over the trial) confirmed that he went over the "pretrial order that delineated the plea offer" with Mr. Tiggs.

At the request of the court, the attorney for the State prosecution has furnished a copy of the filled-out Pretrial Memorandum in this case, on a form issued by the Administrative Office of

---

[9]     On direct appeal, Tiggs's counsel stated that the period of parole ineligibility would be longer, citing N.J. Stat. Ann. § 2C:43-7.2 (eff. 2001) (life sentence deemed 75 years, with 85% parole ineligibility).

the Courts. (DE 22-2) This may be the "pretrial order" referred to by the Assistant Prosecutor and the PCR judge; in any event it thoroughly supports their statements, cited above. The entries are handwritten, either by Mr. Tiggs or by his attorney on his behalf. The form is personally initialed by Mr. Tiggs on each page, signed by him, and dated January 16, 2007. (*Id.*) The form is particularly relevant because it states the maximum penalty of life imprisonment, memorializes the deadline to accept a guilty plea, acknowledges that defendant does not wish to plead guilty, and sets the matter for trial.

The pretrial memorandum lists the three charges in the Indictment: murder, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. The maximum jail term for murder is listed as "life," and again the "Maximum sentence if convicted" is given as "Life." (DE 22-2 at p. 1 ¶¶ 1, 5) The application of the 85% parole ineligibility law is explicitly acknowledged. (*Id.* ¶¶ 4, 6) Mr. Tiggs placed his initials at the bottom of this (and every) page.

The next page states that there is no plea agreement offered. These questions and answers follow:

> 10. Do you understand that if you reject this plea offer, the Court could impose a more severe sentence than recommended by the plea offer, up to the maximum sentence permitted is you are convicted after trial? [**YES** is circled]

> 11. Do you understand that if you reject this plea offer today, no negotiated plea can be accepted by this Court unless specifically authorized by the Criminal Presiding judge pursuant to R. 3:9-3(g)? [**YES** is circled]

(DE 22-2 at p. 2) This page, too, is initialed by Mr. Tiggs.

The fourth and final page is signed by the Assistant Prosecutor, the Judge, and defense counsel, Mr. Rojas. Beneath their signatures are three warnings directed to the defendant, Mr. Tiggs, personally. The third is relevant:

> 3. I understand that except in extraordinary circumstances, the filing of this Memorandum ends all plea negotiations, and no further bargaining will take place. Any subsequent plea of guilty will be without a plea recommendation.qe

(DE 22-2 at p. 4) Directly beneath this warning appears the full signature "Arthur L. Tiggs," witnessed by counsel, Mr. Rojas. (*Id.*)

This form establishes that the PCR judge, as well as the affirming appellate court, were correct when they found factually that Mr. Tiggs acknowledged on the record that he was not misadvised as to the maximum sentence when he elected to forgo a guilty plea and proceed to trial. The state courts' determination of the facts, then, was not unreasonable in light of the record; indeed it was firmly rooted in the record, and therefore cannot be disturbed by this Court. *See Quintana v. Administrator*, No. 13-7135 (JMV), 2017 WL 4329736, at *15 (D.N.J. Sept. 29, 2017) (rejecting petitioner's claim that counsel was ineffective for failing to properly advise him of sentencing exposure).

Tiggs has failed to demonstrate deficient performance or prejudice under *Strickland* with respect to his counsel's advice regarding the maximum sentence. There is no basis for me to conclude that the Appellate Division's resolution of this claim is contrary to or an unreasonable application of *Strickland*. I therefore deny Tiggs's habeas petition insofar as it claims that his attorney's inaccurate advice regarding the maximum sentence undermined the voluntariness of his guilty plea.

### 7. Additional Ineffective Assistance Claims

Two additional ineffective assistance of counsel claims are presented in Mr. Tiggs's habeas petition. Both were raised during his PCR proceedings, but they do not appear to have been specifically addressed by the PCR court or the Appellate Division. Mr. Tiggs faults trial counsel for (a) failing to object to the presentation of "a close-up photo of the bullet wound to the [victim's] forehead" as unduly prejudicial and (b) not stipulating to the victim's cause of death. (*See* DE 1-1 at 7; DE 9-16 at 3.)

To the extent those claims were not previously addressed by the state courts on the merits, I will review them *de novo*. This challenge is related to the June 12, 2007 testimony of the medical examiner who performed the autopsy on Lance Pettiford, Dr. May Jennifer Amolat. (DE 9-31 at 131-148.) Dr. Amolat, the last witness at trial, testified in her capacity as a medical expert. (*Id.* at 132-33.) In the course of her testimony, Dr. Amolat she reviewed a photo and opined that Pettiford died of a gunshot wound to the head that was likely fired from close range. (*Id.* at 143-44.)

Had counsel stipulated to Pettiford's cause of death, says Tiggs, the medical examiner's testimony and accompanying photograph would have been unnecessary and therefore inadmissible. I am not convinced that a cause-of-death stipulation would have resulted in the exclusion of Dr. Amolat as a witness. The fact witnesses, to be sure, left little doubt that Mr. Pettiford died from the gunshot wound, but they did not actually see the shooting. They could not establish, for example, that the fatal shot was fired at close range, and indeed from a gun pressed directly against the victim's head. The prosecution's circumstantial case depended heavily on Tiggs's location shortly before and after the gun went off; if the victim had been shot at long range, for example, the evidence of Tiggs's location and flight would have been less telling. Even a cause-of-death stipulation, then, might not have eliminated the need for Dr. Amolat's expert testimony.[10]

The testimony and photographic evidence were surely relevant and admissible. Based on the considerations above, I am unable to conclude that failure to stipulate fell below professional

---

10      And there was always the strategic consideration that a jury might wonder how Tiggs possessed the knowledge that would permit him to stipulate to the cause of death. Competent counsel might well have wished to avoid even the appearance that Tiggs knew anything at all about the events surrounding Pettiford's death.

standards. Indeed, I cannot conclude competent defense counsel would have succeeded in excluding this evidence, even *via* an offer to stipulate to the cause of Pettiford's death. Mr. Rojas was not ineffective because he did not stipulate to Pettiford's cause of death or otherwise object to the admission of that evidence. *D'Amario*, 403 F. Supp. 2d at 370 ("Counsel was not ineffective for failing to object to testimony for which there was no factual basis to object.").

Finally, I am not persuaded that prejudice resulted. "It is not enough for [Tiggs] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, Tiggs must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Dr. Amolat's testimony was brief. Based on my review of the transcript, I conclude that her testimony was not inflammatory, but rather objective, dispassionate, and entirely clinical in nature. The photograph, to be sure, depicted a fatal wound, but that hardly came as news to the jury. There is no contention that the photo was so gruesome as to impair the jurors' impartiality, and the photo itself is not in the record before me.

Habeas relief on these grounds is therefore denied.

\* \* \*

In sum, I conclude – based on the reasons set forth above – that Mr. Tiggs is not entitled to habeas relief based on any of the claims of ineffective assistance of counsel that he raises in Grounds Five and Six of his § 2254 petition.

## D. Grounds Six, Seven and Eight: PCR Court's Failure to Hold Evidentiary Hearing

In each of his six, seventh, and eighth habeas grounds, Mr. Tiggs asserts that the PCR court erred because it declined to hold an evidentiary hearing prior to denying post-conviction relief. (DE 1-1 at 9-16; DE 1 at 13.) The failure to conduct an evidentiary hearing in PCR

proceedings is insufficient to require habeas relief. Indeed, "the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998); *see also Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004) ("habeas proceedings are not the appropriate forum for [a petitioner] to pursue claims of error at the [State's collateral] proceeding."); *accord* 28 U.S.C. § 2254(a) (federal habeas relief available for violations of the Constitution, laws or treaties of the United States). Thus, Grounds Six, Seven, and Eight – which, at their core, each seek habeas relief based on procedural shortcomings in the collateral PCR proceedings – do not present a valid basis for relief under 28 U.S.C. § 2254. *See Davis v. New Jersey*, No. 12-5748 (JLL), 2014 WL 2615657, at *17 (D.N.J. June 12, 2014) (petitioner's assertion that "PCR court erred by not holding an evidentiary hearing . . . fails to state a cognizable § 2254 claim.").

## E. Certificate of Appealability

A petitioner may not appeal from a final order in a habeas proceeding where a petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). I find that none of the claims raised in Tiggs's § 2254 meet the foregoing standard, and I will accordingly decline to issue a certificate of appealability.

## V.   CONCLUSION

For the reasons stated above, Mr. Tiggs's habeas petition is denied, and the court will not issue a certificate of appealability. An appropriate Order accompanies this Opinion.

Dated: March 8, 2019

KEVIN MCNULTY
U.S. District Judge